[Civ. No. 11912.   Third Dist.   Aug. 6, 1968.]

MICHAEL DAVID RICHERSON, a Minor, etc., Petitioner, v. THE SUPERIOR COURT OF SACRAMENTO COUNTY et al., Respondents; THE PEOPLE, Real Party in Interest.

Kenneth M. Wells, Public Defender, and Roy V. Williams, Assistant Public Defender, for Petitioner.

No appearance for Respondents.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edward A. Hinz, Jr., and Arnold O. Overoye, Deputy Attorneys General, for Real Party in Interest.

PIERCE, P. J.—Two minors, both junior college students, one, petitioner, Michael David Richerson, age 18 years, and the other Robert Richmond, age 19, participated in the burglary of a department store. One of them, Robert, was also involved in an armed robbery of a store employee. (The record indicates that petitioner, Michael, was not involved in the latter crime.)

The details of the burglary, and so far as Robert is concerned of the other crime, are spelled out in a pretrial report of the Probation Officer of Sacramento County, dated January 16, 1968, and filed in the Municipal Court of Sacramento County in People v. Michael David Richerson. Thereafter Michael was referred to the juvenile court as being fit for processing by that court. A hearing was held in the Juvenile Court of Sacramento County. A second probation officer's report was filed in which the earlier report was referred to and attached. Except for inconsequential corrections in the latter, the two reports are for all practical purposes identical. Both reports reveal in Michael's background nothing but favorable material. (This will be summarized below.) Nevertheless, the second report recommends that Michael be remanded to the certifying court and that the juvenile petition

be dismissed. The recommendation was upon the expressed grounds: (1) that Michael was "emancipated from his parents' home"; (2) that he "had the ability to know right from wrong"; and (3) that he had admitted involvement in the commission of an offense punishable as a felony. *His "behavioral" background is not mentioned in connection with this recommendation.* The hearing was held February 9, 1968. A transcript of that hearing is before us. The hearing was perfunctory and consisted of the admission of the reports referred to above and a brief summary thereof by the deputy probation officer. The court made its findings. Effectually they accepted and repeated the recommendations of the probation officers. The judge stated: "I don't feel that we could—that he would be amenable to our treatment and training program." Michael was ordered back to the municipal court for proceedings there. *Again, there was no reference to Michael's behavioral background.*

The matter is before us on a petition for a writ of prohibition directed to the Sacramento County District Attorney and a petition for a writ of mandate directed to the Juvenile Court of Sacramento County. Petitioner seeks to compel the latter to vacate its order and to exercise a discretion imposed by a legislative mandate contained in the 1967 amendment to Welfare and Institutions Code section 707.

Before 1967 that section had empowered the juvenile court to refer minors 16 years old or over to a court for trial under the appropriate criminal statute whenever the court considered the minor not to be amenable to rehabilitation through juvenile court facilities. The 1967 amendment added specific conditions. It provided the *offense itself* was not sufficient *ipso facto* to support the finding and order described. The juvenile court was charged with a duty to cause a probation officer to report on "behavioral patterns."[1]

The contention of petitioner in support of his petition may be expressed in the terms of the petition itself: "There is nothing in the report submitted to the Juvenile

---

[1] The portions of section 707 pertinent are:

"In determining whether the minor is a fit and proper subject to be dealt with under this chapter, the offense, in itself, shall not be sufficient to support a finding that such minor is not a fit and proper subject to be dealt with under the provisions of the Juvenile Court Law.

". . . . . . . . . . . .

"The court shall cause the probation officer to investigate and submit a report on the behavioral patterns of the person being considered for unfitness."

Court by the probation officer or the report submitted to the Municipal Court by the probation officer to indicate that this defendant has fallen into a behavioral pattern which would render him unfit as a proper subject under the provisions of the Juvenile Court law."

We have concluded the contention is sound. Petitioner asserts that the juvenile court abused its discretion. We do not agree. We consider that it failed to exercise a discretion which the statute had enjoined upon it to exercise. Specifically, the court (1) failed to consider anything other than the crime itself; (2) if the report submitted by the probation officer can be said to constitute a report complying with the last sentence of amended section 707, then the court cannot be deemed to have considered "the behavioral patterns"[2] of Michael. Such behavioral patterns disclosed by the report point to a minor who *is* a "fit and proper subject to be dealt with under the Juvenile Court Law."

We state the facts disclosed by the record in more detail. Michael was a freshman at Sierra College. His I.Q. was 107.[3] His ambition was to become an architect and he was concerned about the low grades (three "D's" and one "F") he was getting at the outset of his brief college career. His college counselor indicated he had been in no previous difficulties, that he had very good work habits, that he was honest, and that he possessed an excellent moral character. He had graduated from a Roseville high school in June 1967 with a "strong" "C" average. "His teachers remembered him as a quiet, sincere, and conscientious student who never presented any problems." The appraisal of his high school counselor was that he was basically honest, shy and lacking in self-confidence. "[I]t was his [the counselor's] feeling that the company he kept would be instrumental in determining the path the defendant was to follow in the future."

Michael was the second of four children in a low-to-middle

---

[2]The words "behavioral patterns" are somewhat vague. The definitions which we select from Webster's Third New International Dictionary which seem best to fit the Legislature's meaning are: Behavior: "the manner in which a person behaves in reacting to social stimuli . . . or to inner need . . . or to a combination thereof . . . the treatment shown by a person toward another or others esp. in his conformity with or divergence from the norms of good manners or social decorum." Pattern: ". . . a reliable sample of traits, acts, or other observable features characterizing an individual." So defined the 1967 amendment to section 707 is not void for uncertainty.

[3]This fact should be noted in connection with the probation officer's report and the court's finding that Michael was "highly intelligent."

income family. The marriage of his parents was intact. Michael's father had been steadily employed for 25 years by the Division of Forestry, State of California. Due to a serious and expensive illness suffered by the father the family was hard-pressed financially. Still the family, lifelong residents of their community, were buying a home. Michael had enjoyed good relations with his parents and siblings. His closer attachment was to his mother. She mentioned his willingness to help around the home and stated she had probably taken advantage of this. Michael denied using narcotics or intoxicants. He belonged to a church. As a boy he had done yard work and miscellaneous odd jobs, including baby sitting. He had had, and worked steadily at, a newspaper route. All former employers described him as honest, industrious, courteous, respectful, dependable. Character references had all responded, speaking very highly of Michael. One response is significant. It suggests immaturity for a boy of eighteen. The same person emphasized that Michael could be "trusted to tell the truth even when it hurts."

The incident upon which the charge is based occurred December 16, 1967. Two weeks before Robert and Michael had rented a duplex and had taken up housekeeping together.[4]

The record does not disclose in the mind of which of the two boys the idea to burglarize a market had originated. One stated the expression of the idea had been treated as a joke at first. As a serious burglary plan germinated, the purpose seems to have been to stock the apartment with provisions. (But "alcoholic beverages" were included. Compare Michael's statements that he did not use intoxicants.) The evolved plan: Robert was to enter the store. Michael was to wait outside and enter after the market closed. Robert was to let him in.

Execution was not according to plan. About 10 p.m. Robert was in the store. Michael was outside. He went into the boiler room of the market. His stated reason was that he was cold and that he was suffering from bursitis and went into the boiler room to get warm. (The story does not rule out "cold feet" as an additional reason.) Whatever his reason, Michael was found in the boiler room by the officers at approximately 2 a.m.

Meanwhile, Robert had unilaterally effected a change of

---

[4]Both the probation officer's second report and the juvenile court judge's findings mention that Michael was "emancipated." The emancipation period had been very brief indeed.

plans. He was carrying a hand gun in his waist band.[5] He had thought the market was unoccupied. He started loading items from the store shelves in a cardboard box. He then learned he had been mistaken in his belief he was alone in the market. He discovered a night employee—the victim. Robert then masked himself and held up the victim at gun point. The victim was compelled to saw off a padlock. Robert then tied his hands and feet with tape and escaped carrying the cardboard box with him. When he did not see Michael in the vicinity he drove away.

The store employee managed to work his way to the front door of the store where he finally caught the attention of passing officers. Meanwhile, Robert had hidden the stolen articles and had returned to the market area to look for Michael. Robert was apprehended by the officers at approximately 1:45 a.m. Michael was then discovered in the boiler room. He told the arresting officers he was in there "keeping warm" and was waiting for a friend. Both Michael and Robert later made full and voluntary confessions. The reports stress that Michael was very remorseful. The summary above is substantially an outline of their statements as written in the probation officers' reports.

We have given a somewhat elaborate account of the facts disclosed by the record. It appears to us they demonstrate that the juvenile court considered nothing other than "the offense itself." The judge's oral findings are a repetition of the recommendations of the probation officer. True, the words "emancipation" and "high intelligence" are used but as applied to Michael, apparently only two weeks away from living at home and with a barely average I.Q., studying hard to overcome flunking grades in junior college, the terms are scarcely accurate.

▇▇ The 1967 amendment of section 707 of the Welfare and Institutions Code, which charges the juvenile court judge to cause a report to be made by the probation officer as to the minor's "behavioral pattern," implies that the judge must weigh that pattern with the offense itself after it is received in arriving at a conclusion as to whether or not the minor can benefit by the facilities of the juvenile court system. ▇▇ The incomplete background history of Michael given above

---

[5]Michael had known that Robert owned the gun. He had seen it in their apartment. He stated to the officers he had known Robert used it for target practice but did not realize that Robert had it with him that night. Robert reaffirmed Michael's claim of lack of knowledge Robert was carrying a gun and assumed full responsibility for its use.

(which is all the judge had before him) is antipodal to any fact finding justifying a conclusion that rehabilitation of this minor must be sought through criminal prosecution and not by means of juvenile court procedures. It thumbnails a youngster, immature for his age, susceptible, no doubt, to influence, but with no evidenced vicious tendencies, and except for this one misdeed (the offense itself) normal, mentally healthy and socially adjusted. That fact forces us to believe that the judge (and the deputy probation officer who recommended criminal prosecution) must have *overlooked* the 1967 amendment to section 707.

Neither do we assume to usurp the fact-finding functions of the juvenile court. That which the record discloses may or may not give Michael's true and complete ''behavioral'' background. Petitioner's written and oral arguments admit the picture now is skeletal. The juvenile court is the proper forum in which to fill in the flesh. The Legislature's command to the juvenile court to measure amenability to juvenile court system treatment by balancing behavioral patterns in the minor's history against the seriousness of the offense committed has not been heeded. It must be.

Let a peremptory writ of mandate issue directing respondent juvenile court to vacate its order of February 9, 1968, in this matter and to cause the probation office to complete its investigation and submit a report which shall include the behavioral background of petitioner as fully as this may be learned; thereafter to consider said report and such further evidence as may be adduced at a rehearing of this matter; then to make such further order or orders as may be proper in accordance with the law and the views expressed herein. Let a writ of prohibition issue directing respondent district attorney to take no further action in any criminal proceeding against petitioner in this matter under said order of February 9, 1968, or otherwise, pending determination of the juvenile court proceedings involving petitioner.

Friedman, J., and Regan, J., concurred.