[Crim. No. 8097. First Dist., Div. Two. May 24, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT McFARLAND, JR., Defendant and Appellant.

810

## COUNSEL

Richard J. Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci, and William D. Stein, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TAYLOR, J.**—Defendant, Robert McFarland, appeals from a judgment entered on a jury verdict finding him guilty of murder (Pen. Code, § 187) and from the prior proceedings transferring him from the juvenile court, pursuant to Welfare and Institution Code section 707.[1] As to the juvenile court proceedings, appellant contends that: 1) the juvenile court's initial jurisdictional finding, pursuant to Welfare and Institutions Code section 602 and the subsequent transfer to the superior court, caused jeopardy to attach within the meaning of the Fifth and Fourteenth Amendments of the U.S. Constitution, so that Welfare and Institutions Code section 707 and the transfer procedure are unconstitutional; 2) the order finding that he came under the jurisdiction of the juvenile court, pursuant to Welfare and Insti-

---

[1]The record of the juvenile court proceedings is incorporated by reference from In re Ronald L., No. 26258.

tutions Code section 602, was invalidated by the unconstitutional admission of his extrajudicial statements, as well as the application of the preponderance of the evidence standard; and 3) the order, pursuant to Welfare and Institutions Code section 707, finding him not amenable to the programs of the juvenile court was not based on sufficient evidence or the study required by the statute. As to the judgment of conviction, appellant contends that the improper and prejudicial admission of the testimony of the witness, Arthur Givens, and the insufficiency of the evidence to corroborate the testimony of the accomplice, Dennis Parrish, require a reversal.

Because of the length and complexity of the issues raised, we will set forth the pertinent facts and issues relating to the juvenile and superior court proceedings separately.

## I. THE JUVENILE COURT PROCEEDINGS

The record reveals the following pertinent facts: On July 11, 1968, three separate petitions were filed in the juvenile court charging that on April 9, 1968, appellant and his co-perpetrators, Ronald Lewis and Joseph Brown, robbed and killed San Francisco bus driver Martin Whitted. The petition as to appellant also contained a notice of a hearing pursuant to Welfare and Institutions Code section 602, i.e., a jurisdictional hearing to determine whether appellant had committed the offense charged.

Prior to the admission of any testimony at the hearing, the court denied a defense motion that the applicable standard of proof was beyond a reasonable doubt rather than a preponderance of the evidence. At the hearing, which commenced on August 1, 1968, the People adduced eyewitnesses and other testimony concerning the offense charged and a statement taken from appellant under the following circumstances: On the morning after the killing, April 10, 1968, several San Francisco police officers proceeded to appellant's home and found him asleep in the living room. Appellant was awakened by his mother, who had admitted the officers. Officer Sanders informed appellant that he was under arrest, but did not at that time advise him of his rights.

After some discussion with appellant and his mother, appellant was handcuffed and taken to the Hall of Justice. On the way, Sanders verbally admonished him of his rights, and asked if he understood them and wanted to talk. Appellant answered both questions affirmatively and made a statement to Sanders concerning the offense. At the Hall of Justice, appellant was read a "juvenile rights card" by Probation Officer Licavoli and thereafter stated that about 7 p.m. on April 9, he and three others, one armed with a gun, headed for the 900 block of Innes Street to commit armed robbery.

They stopped a bus driven by Whitted; then three of them boarded the bus and the one with the gun told Whitted it was a holdup. Whitted did not respond. After appellant reached for the money changer, a scuffle ensued and the gun went off. All four ran up the hill to the home of one of the participants and split up the money in the changer. This statement and a subsequent one,[2] were admitted over appellant's timely objections. Prior to the statement, no effort was made by anyone to contact appellant's mother and inform her that she had a right to an attorney.

In the course of the section 602 hearing, the court indicated it would then proceed to make a determination whether appellant was to be tried by the juvenile court or the superior court pursuant to sections 702 and 707. The People then introduced the testimony of Mr. Miller of the San Francisco Juvenile Probation Department. Miller indicated that while he had never personally spoken with appellant,[3] he was familiar with his case from a review of the files and with appellant's prior behavior insofar as it related to the Youth Guidance Center and juvenile court. Miller submitted the report on appellant's behavior patterns, set forth in the footnote below.[4]

After Miller indicated that appellant's age was 17 as of January 30, 1968, and some discussion as to the meaning of the term "social study," the court admitted the report over appellant's objection. On cross-examination, Miller indicated that he did not know whether appellant had denied the petty theft charge brought in 1964 or the particular circumstances of the malicious mischief charges in December 1965, and the March 10, 1966 petty theft charge. After a recess to allow him to re-examine the files, Miller

---

[2]The two statements were substantially identical, except that in the later one, appellant indicated that the person who had the gun as they boarded the bus was not the person who had the gun after the shooting.

[3]Apparently Miller had been instructed by his superiors not to speak to appellant.

[4]"Robert McFarland was first referred to the San Francisco Probation Department on a citation on May 23, 1964, on a charge of petty theft. The disposition made by the probation officer was admonishment and dismissal without Court action.

"Again, on December 3, 1965, he was referred for malicious mischief. The same disposition: admonishment and dismissal.

"On December 6, 1965, malicious mischief. Admonishment and dismissal.

"March 10, 1966, he was released and booked at the Youth Guidance Center for petty theft. This matter was disposed of by admonishment and dismissal without Juvenile Court action.

"August 3, 1966, . . . burglary, for which he was adjudged a ward of the Court and placed on probation and was ordered to serve 30 days in a Juvenile Hall as a condition of that probation.

"June 6th—June 14, 1967, his next court appearance, was for battery, at which time the Court ordered that he be committed to Log Cabin Ranch School on a suspended basis, and further that he spend 30 days in the Juvenile Hall as a condition of suspending the commitment.

"The present court status is that Robert is still a ward of the San Francisco City and County Juvenile Court, on probation."

explained that the portion of his report relating to petty theft in May 1964 was erroneous, as appellant had merely been referred for malicious mischief, which was denied, and disposed of by admonishment and dismissal and that there was only one citation for malicious mischief in 1965. Miller also indicated that in February and May 1967, respectively, charges of petty theft and purse snatching against appellant were dismissed for lack of evidence, but that in July 1967, appellant admitted an auto theft and was committed to the California Youth Authority (hereafter CYA) on probation until March 1968. Miller also indicated that appellant had never had diagnostic treatment or psychiatric interviews at juvenile hall, nor ever been committed to a CYA institution. Miller based his conclusion that appellant would not be amenable to the programs of the juvenile court on his past behavior.

To rebut Miller, appellant called Mr. Finster, the supervising parole agent for the CYA in San Francisco, who had been in parole work for 12 years and was familiar with the facilities available to the juvenile court, including those of the CYA. Finster stated that he could not draw any conclusions as to whether appellant would be amenable to juvenile court facilities from the report without access to psychiatric or psychological tests or a social history. He indicated that youngsters charged with murder had been committed to the CYA, that appellant's past behavior was similar to that of most cases received by the CYA, and showed less criminal activity than that of the majority of CYA wards.

Thereafter, the juvenile court found that each of the minors was a person described in section 602 of the Welfare and Institutions Code. The court further found that Lewis, who was under the age of 16, would be amenable to the care and treatment of the juvenile court, while appellant and Brown, who were over 16, would not be amenable to the juvenile court programs. Accordingly, the court ordered the petition as to appellant and Brown filed in the juvenile court dismissed and directed their prosecution in the superior court. Appellant's subsequent motion of once in jeopardy was denied.

Thereafter, on August 15, 1968, appellant, Brown and Dennis Parrish, who was over 18 and charged as an adult, were indicted by the grand jury for the murder of the bus driver. After counsel was appointed to represent appellant, the court denied a motion to dismiss the indictment made pursuant to Penal Code section 995 on the grounds that the superior court lacked jurisdiction because of improper certification. Subsequently, the trials of Parrish and Brown were severed.

Contentions identical to those made by appellant concerning double jeopardy and the constitutionality of the transfer procedure (Welf. & Inst.

Code, §§ 701-707) were recently rejected by this court (Division Four) in *People* v. *Brown,* 13 Cal.App.3d 876 [91 Cal.Rptr. 904]. The court said at pages 880 and 881: "Under Welfare and Institutions Code section 701, the court is first to consider, at the jurisdictional hearing, 'only the question whether the minor is a person described by [section] 602.' It is provided by section 702 that '[a]fter hearing such evidence, the court shall make a finding, *noted in the minutes of the court,* whether or not the minor is a person [coming within the court's jurisdiction].' (Italics added.) Section 702 (and later sections) go on to provide for further and separate proceedings to decide upon placement after adjudication has occurred. (Cf. *In re Corey* (1968) 266 Cal.App.2d 295 [72 Cal.Rptr. 115].) It is then provided in section 707 (in language which might sequentially be better placed before the dispositional provisions of section 702) that '[a]t any time *during* a hearing upon a petition . . . when substantial evidence has been adduced to support a finding that the minor was 16 years of age or older at the time of the alleged commission of such offense and that the minor would not be amenable to . . . the facilities of the juvenile court . . . the court may make a finding *noted in the minutes of the court* that the minor is not a fit and proper subject to be dealt with under [the Juvenile Court Law]. . . .' (Italics added.) Thereupon, criminal proceedings are to be commenced. When the statutes are so compared, it is seen that the Legislature has provided a channel of adjudication which may be described as having a downstream fork at the point where unfitness may be determined under section 707. That determination is to be made not after juvenile court jurisdiction has been established but *during* the jurisdictional hearing. Therefore the consequence of the determination, when viewed before the commencement of a proceeding, is not to permit criminal proceedings to be brought against one who has already suffered deprivation of liberty as a result of a determination of wardship; *rather, it is to divert the 'unfit' minor into a procedural stream which may result in criminal punishment but not in renewed detention as a juvenile.*" (Italics partially added.)

In this exceptionally well reasoned opinion, the court expressed its doubt as to the vitality of *People* v. *Silverstein,* 121 Cal.App.2d 140 [262 P.2d 656], which had held that the double jeopardy provisions did not apply to the civil proceedings held pursuant to juvenile court laws. On February 24, 1971, our state Supreme Court denied a hearing in the *Brown* case. Thereafter, on March 24, 1971, the Supreme Court filed its decision in *Richard M.* v. *Superior Court,* 4 Cal.3d 370 [93 Cal.Rptr. 752, 482 P.2d 664], holding that the double jeopardy bar of the Fifth Amendment applied as to a second juvenile proceeding based on the same offense. The Supreme Court noted that juveniles are entitled to the fundamental pro-

tections of the Bill of Rights in proceedings that may result in confinement or other sanctions, whether or not these proceedings were labeled criminal or civil, and expressly disapproved *People* v. *Silverstein, supra,* and other cases following it.

The Supreme Court also held that the protection against double jeopardy applies whether the accused is convicted or acquitted in the initial proceeding and pointed out that in the second proceeding, the minor was not immune from the possibility that the court would determine that he was not amenable to the program of the juvenile court and order prosecution under the applicable criminal statute. Although the above language appears to provide surface validity for appellant's double jeopardy contention, we see no inconsistency between *Richard M.* and *People* v. *Brown, supra. Richard M.* involved two separate and distinct juvenile proceedings held pursuant to section 602, the first proceeding having resulted in a finding that the petition was not sustained and a dismissal. ▮ *People* v. *Brown,* like the instant case, merely involved one juvenile proceeding, limited and preliminary in disposition, wherein the court made the necessary initial finding that appellant, as a minor, was subject to the jurisdiction of the juvenile court and the subsequent finding that he was not amenable to the programs of the juvenile court, and then the transfer to the superior court. We conclude, therefore, that here, as in *People* v. *Brown,* the ensuing criminal prosecution was not contrary to the statute and did not expose appellant to double jeopardy.

We turn next to the contention that the determination made by the juvenile court pursuant to section 602, namely, that appellant had committed the offense in question, was invalidated by the admission of his extrajudicial statement, as well as by the erroneous application of the preponderance of the evidence standard. ▮ As indicated above, the juvenile court admitted the testimony of Officer Sanders concerning the statement appellant had made to him after his arrest. At the time this statement was taken, appellant had been advised of his rights and the right to counsel, but his mother had not been so advised.[5]

It is well settled in this state that the exclusionary rule of *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d

---

[5]Welfare and Institutions Code section 627.5 provides, so far as pertinent: "In any case where a minor is taken before a probation officer pursuant to the provisions of Section 626 and it is alleged that such minor is a person described in Section 601 or 602, the probation officer shall immediately advise the minor and his parent or guardian that anything the minor says can be used against him and shall advise them of the minor's constitutional rights, including his right to remain silent, his right to have counsel present during any interrogation, and his right to have counsel appointed if he is unable to afford counsel."

▮

974], applies to juvenile court proceedings (*In re Steven C.,* 9 Cal.App.3d 255, 267 [88 Cal.Rptr. 97]; *In re H.L.R.,* 269 Cal.App.2d 610 [75 Cal. Rptr. 308]; *In re Rambeau,* 266 Cal.App.2d 1 [72 Cal.Rptr. 171]; *In re Teters,* 264 Cal.App.2d 816, 821 [70 Cal.Rptr. 749]). In *In re Dennis M.,* 70 Cal.2d 444 [75 Cal.Rptr. 1, 450 P.2d 296], the Supreme Court held that a warning given to the minor alone was sufficient because from the totality of circumstances, there was substantial evidence that the minor had the capacity to understand the meaning of the warnings and that he had knowingly and intelligently waived his rights. Relying on *People* v. *Lara,* 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202], wherein the race, age, experience with police, education, mental and physical condition at the time of questioning and level of intelligence were all declared factors to be considered in assessing waiver, the court in *Dennis M.* observed, at pages 462-463: "We recognized that the advice and consent of an adult in this connection 'is of course to be desired, and should be obtained whenever feasible,' but we concluded that 'whether a minor knowingly and intelligently waived these rights is a question of fact; and a mere failure of the authorities to seek the additional consent of an adult cannot be held to outweigh, in any given instance, an evidentially supported finding that such a waiver was actually made.' "

██    There can be no presumption of a knowing and intelligent waiver. The waiver must affirmatively appear of record (*People* v. *Stewart,* 62 Cal.2d 571, 581 [43 Cal.Rptr. 201, 400 P.2d 97]). Whether a minor has waived his rights intelligently and knowingly is a contextual question of fact (*People* v. *Lara, supra,* p. 379; *In re Dennis M., supra,* p. 463; *People* v. *Brockman,* 2 Cal.App.3d 1002, 1008 [83 Cal.Rptr. 70]). Procedurally, the determination of the issue is primarily for the trial judge and his determination will not be disturbed unless, in the light of the applicable principles, it is palpably erroneous (*People* v. *Brockman, supra; People* v. *Stafford,* 240 Cal.App.2d 422, 424 [49 Cal.Rptr. 598]).

██    The record here discloses that appellant was warned twice, once in the automobile and again at juvenile hall, and indicated that he had understood the warnings. He was a 17-year-old minor with a good deal of prior police contact. Furthermore, there is of record no evidence that appellant was below average intelligence or awareness or that he was physically or mentally fatigued or in any way coerced at the time of his statement. Accordingly, on these facts, we conclude that his admission to Officer Sanders was made pursuant to a knowing and intelligent waiver of rights (cf. *In re Stevens C., supra,* pp. 267-268), and we further conclude that the error, resulting from the violation of the statutory procedure requiring an admonition to his mother, was harmless beyond a reasonable

doubt (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]).

█ As to appellant's contention concerning the burden of proof, the record indicates that the juvenile court denied a motion that the applicable standard be beyond a reasonable doubt. Since the juvenile court hearing was held in 1968, before the decision of the U.S. Supreme Court in *In re Winship,* 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], the court properly applied the preponderance of the evidence standard then applicable to all juvenile proceedings in California. However, *Winship* held that proof beyond a reasonable doubt is a requisite to due process at the adjudicatory stage of state juvenile court proceedings. Subsequently, the California courts held that the reasonable doubt standard applies to all cases, such as the instant one, which were pending on direct appeal at the time the *Winship* judgment was rendered on March 31, 1970 (*In re Steven C., supra,* p. 262). Thus, there is no question that the Winship standard of beyond a reasonable doubt would have applied to the instant case if the matter had remained within the jurisdiction of the juvenile court for final disposition and an automatic reversal would have been required (*In re Kenneth W.,* 12 Cal.App.3d 1120 [91 Cal.Rptr. 702]).

However, here, as noted in *Brown,* the juvenile court's determination based on the preponderance of evidence standard, was made only in a preliminary matter since the court then decided that appellant was to be transferred to the superior court. Under these circumstances, we hold that the failure to apply the reasonable doubt standard was not prejudicial error requiring reversal.

█ Appellant next contends that there was insufficient substantial evidence to support the finding that he was not amenable to the care, treatment and training programs available through the juvenile court, as the report submitted to the juvenile court by Probation Officer Miller was not the report required by statute. The applicable portions of section 707 are set forth in the footnote below.[6]

Appellant relies on *Richerson* v. *Superior Court,* 264 Cal.App.2d 729

---

[6]"In determining whether the minor is a fit and proper subject to be dealt with under this chapter, the offense, in itself, shall not be sufficient to support a finding that such minor is not a fit and proper subject to be dealt with under the provisions of the Juvenile Court Law.

"A denial by the person on whose behalf the petition is brought of any or all of the facts or conclusions set forth therein or of any inference to be drawn therefrom is not, of itself, sufficient to support a finding that such person is not a fit and proper subject to be dealt with under the provisions of the Juvenile Court Law.

"The court shall cause the probation officer to investigate and submit a report on the behavioral patterns of the person being considered for unfitness."

[70 Cal.Rptr. 350], and *People v. Bassett,* 69 Cal.2d 122 [70 Cal.Rptr. 193, 443 P.2d 777]. In *Bassett,* the Supreme Court reduced the first degree murder conviction of an 18-year-old mentally ill offender, to second degree murder, as there was insufficient substantial evidence of his mental capacity to form the requisite intent. As the defendant in *Bassett* had suffered from deep-seated paranoid schizophrenia since childhood, the Supreme Court rejected the evidence of the prosecution's expert psychiatric witnesses who had not had an opportunity to personally interview the accused. Appellant's contention that *Bassett* is similar to the instant case is ingenious, but not well taken.

In *Richerson v. Superior Court, supra,* a transfer to the superior court for trial of an armed robbery charge of an 18-year-old, who had never before come to the attention of the authorities, was reversed because the appellate court concluded from the record that the trial court had either ignored the express provision of the statute that the offense in and of itself was not sufficient to support a finding that the minor was not amenable to the juvenile court law, or had failed to properly consider the report submitted.

*Richerson* was followed by this court (Division One) in *Bruce M. v. Superior Court,* 270 Cal.App.2d 566 [75 Cal.Rptr. 881], where the findings and the transfer were based on the very serious nature of the offenses involved (kidnaping, robbery and rape) and no report on the 17-year-old minor's behavior patterns had been submitted. This court said at page 573: "It is recognized that the determination of whether petitioner was a fit subject for consideration under the juvenile court law rests within the sound discretion of the juvenile court. [Citations.] That discretion must be exercised in accordance and within the framework prescribed by the Legislature."

We cannot agree that in the instant case the court did not exercise its discretion within the framework prescribed by the statute. A detailed report was submitted to the court by Probation Officer Miller who was fully and extensively cross-examined by appellant. Appellant also presented his witness Finster to counteract Miller's recommendation. The cross-examination of Miller revealed some inaccuracies in the report, but also confirmed that appellant had twice before (in June and July of 1967) been made a ward of the juvenile court and spent time at juvenile hall on a number of serious charges—auto burglary, battery and auto theft. In March of 1968, just prior to the instant offense, appellant had been released from probation on the July 1967 auto theft charge. Therefore, the commission of the instant offense after a period of apparent rehabilitation, appellant's delinquent behavior pattern extending over a period of four

years preceding the offense, and his apparent failure to respond to the programs offered by two stays at juvenile hall and one at the Log Cabin Ranch, reasonably support the court's conclusion that appellant was an unpromising candidate for further commitment under the juvenile court law. The court had before it not only the report made by Mr. Miller but had an opportunity to hear and weigh appellant's witness and appellant himself. There was ample substantial evidence to support the court's finding and order of transfer.

## II. THE SUPERIOR COURT PROCEEDINGS

We proceed now to a consideration of the facts and contentions relating to the criminal trial.

The prosecution established that the victim, a municipal bus driver, was killed during a holdup that occurred April 9, 1968, between 7 and 7:30 p.m. at a bus stop between the 800 and 900 blocks of Innes Street in San Francisco. An eyewitness, Mr. Ligouri, testified that at the time, he was seated in a parked car near the bus stop waiting for a friend. He saw the bus come to a stop, saw three Negro girls get off and three or four young Negro men get on. Ligouri heard what sounded like backfire, saw the young men leave the bus and run up the hill. The bus then started rolling and crashed into a pole. As Ligouri approached the bus, he observed the driver slumped over the steering wheel with a wound in his right side. Ligouri, however, could not positively identify each of the four young men he had seen running from the bus as it was beginning to get dark.

Shortly thereafter, Police Officer Yoell arrived in response to a radio broadcast concerning a shooting on a bus. When he entered the bus, the driver was slumped over the steering wheel with a gunshot wound in his right side. The officer concluded that the driver was dead or nearly so and requested an ambulance. He also observed there was no coin changer on the bus. It was established that buses were routinely equipped with coin changers and that drivers were issued a $50 change fund that was ordinarily depleted during the course of the driver's route. An average changer contains between $30 and $35. The pathologist subsequently testified that the bus driver died from a gunshot wound in the abdomen. Officer Waterfield, who arrived sometime after the shooting, indicated he looked all over the bus for the coin changer but could not find it.

Thereafter, the prosecution called Arthur Givens, who testified that on the evening of April 9, he was visited by four or five people, including appellant, Brown, Lewis and Parrish. Givens saw that Brown had a gun and money changer in the pocket of his coat. Brown said he had

just killed a bus driver and had tried to shoot "the mother fucker through the heart." Thereafter, they discussed the sale of a .25 caliber Browning automatic which Lewis demonstrated by firing it into the air. Brown stated that Lewis wanted $25 for the gun. Givens' testimony concerning Brown's statement that he had just killed the bus driver was admitted over appellant's objections based on hearsay and prejudice.

Givens further testified that on the following day (April 10), Ronald Lewis came to Givens' house to meet Givens' brother-in-law about the sale of the gun. Lewis and Givens and Givens' brother-in-law went to a vacant lot where Lewis demonstrated the weapon by firing a number of shots into a telephone pole. Givens' brother-in-law then purchased the gun. This testimony was also admitted over appellant's relevancy objections.

On cross-examination, Givens stated that he had never met appellant before April 9 and did not know his name. Givens also could not remember how appellant was dressed on that evening, although he remembered what Brown and Lewis wore. Givens admitted on further cross-examination that he had been arrested on three counts of burglary with explosives and four counts of receiving stolen property. While Givens was in custody for these offenses, he asked to see a police inspector to discuss the April 9 shooting. Subsequently, all charges against Givens, except one count of receiving stolen property, were dropped. The court refused to permit appellant's counsel to question Givens as to the sentence he received when he pled guilty to the single count of receiving stolen property, the length of the sentence, the time he actually served or any questions concerning Givens' pending motion to reduce his sentence. Appellant's motion to strike Givens' testimony as to the statements of Brown and Lewis on the grounds of hearsay and lack of relevance was denied.

■ Dennis Parrish, the adult accomplice in the robbery and killing of Whitted, testified that about 4 p.m. on April 9, 1968, he met appellant; they stopped by Brown's home to pick up Brown and Lewis, and then proceeded to the Innes Street bus stop. Lewis indicated that he needed some money and had a gun. The four waited until a particular bus stopped and three girls got off. Brown, Lewis and appellant got on the bus, a shot was fired, and all four ran up the hill to Parrish's home where they divided the money from the money changer, which appellant had. Parrish identified the gun in evidence as being like the one that was in Lewis' possession that afternoon.

On cross-examination, after Parrish testified that he had no knowledge of a pending motion to reduce his sentence, appellant asked the trial court

to take judicial notice of the pending motion. The court deferred the motion but later granted it. On further cross-examination, when appellant attempted to elicit from Parrish whether he thought Lewis was serious about robbing a bus driver, the court sustained the prosecution's objection on grounds of materiality. On further cross-examination, appellant elicited an admission that on the evening of the crime, Parrish did not accompany the others to Givens' house. Parrish also indicated that he did not know of any plan to sell the .25 caliber automatic to Givens and did not receive anything from the sale of the gun, and that he did not remember Lewis showing anyone the gun before Lewis boarded the bus.

Over appellant's objection, Inspector Marionetti testified that on July 3, 1968, pursuant to information furnished by Givens, he accompanied Givens to a telephone pole in which he discovered some bullets. The bullets were removed. Thereafter, the inspector contacted Givens' brother-in-law to recover a pistol. On cross-examination, Marionetti indicated that there were more bullets in the pole than were recovered by him and he could not tell how long they had been in the pole. The San Francisco Police Department's criminologist and ballistic expert, Mr. Williams, identified the bullet taken from the deceased bus driver and those taken from the pole as being from the same .25 caliber automatic identified by Marionetti. Inspector Sanders then identified the gun as being the same gun he had recovered from Givens' brother-in-law. After extensive *voir dire* examination concerning the circumstances of appellant's arrest, the court excluded both of appellant's statements.[7]

Mrs. Givens testified on direct examination that about 7 p.m. on April 9, Lewis, Brown and appellant arrived at her home with a gun and a money changer. The gun differed from People's Exhibit 14 in that it had a white handle. Over appellant's objection, Mrs. Givens was allowed to testify that she heard Lewis tell her husband he wanted to sell a gun. She heard a gun go off and Ronald Lewis had fired it. Mrs. Givens remembered the April 9 visit because she was looking at a Tarzan picture. On cross-examination, Mrs. Givens indicated that she could not remember the person who played Tarzan in the picture she was watching but that it was the day after the bus driver was killed and she was not sure how many people had come to the house. She did not remember the testimony she had given in the juvenile proceedings to the effect that she did not know any of the visitors except Lewis and Brown. She also could not remember whether she had

[7]The record, however, indicates that the warning card used in apprising appellant of his rights prior to the statement in juvenile hall and one of appellant's statements erroneously found their way before the jury. Apparently, both were admitted into evidence and the mistake was not discovered by appellant's counsel until after the verdict.

been under oath at that time or was under oath at the present time. When read her prior testimony that she was not sure whether or not appellant had been present, she indicated that it was true.

Appellant's only witness at the trial was Miss Barron, one of the girls who got off the bus just prior to the shooting. Miss Barron testified she saw four boys standing at the bus stop but would not say whether or not appellant was one of them.

Appellant's contentions concerning the criminal proceedings are that the admission of Givens' testimony concerning the hearsay statements of Brown and Lewis was prejudicial, and that there was insufficient evidence to corroborate the testimony of Parrish.

Appellant asserts that the statements made to Givens by Brown and Lewis were inadmissible hearsay and made after the conspiracy had come to an end. Citing *Krulewitch* v. *United States,* 336 U.S. 440 [93 L. Ed. 790, 69 S.Ct. 716], and *Grunewald* v. *United States,* 353 U.S. 391 [1 L.Ed.2d 931, 77 S.Ct. 963, 62 A.L.R.2d 1344], and Evidence Code section 1223,[8] appellant contends that there is no showing of a continuing conspiracy after the robbery and shooting when the co-perpetrators had fled and divided the money. However, *Grunewald* and *Krulewitch* held only that after the central criminal purposes of a conspiracy had been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime in order to escape detection and punishment. In the instant case, the conspiracy had not been completed[9] prior to the statements made. On the very evening of the offense,

---

[8]"Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:

"(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy;

"(b) The statement was made prior to or during the time that the party was participating in that conspiracy; and

"(c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b). . . ."

[9]In *Krulewitch,* six weeks had elapsed between the offense and the statement sought to be admitted; in *Grunewald,* the conspirators were alleged to have fraudulently obtained no prosecution rulings from the Bureau of Internal Revenue in 1948 and 1949, and were not indicted until 1954. The government contended in order to avoid the three-year statutory bar to prosecution that a conspiracy to conceal continued in existence during all of these years. Furthermore, it does not follow that because the federal courts have declined to extend the hearsay exception to include out-of-court statements made during the concealment phase of a conspiracy, such an extension automatically violates the confrontation clause (*Dutton* v. *Evans,* 400 U.S. 74 [27 L.Ed.2d 213, 222, 91 S.Ct. 210]).

the co-perpetrators proceeded within a short time to Givens' home to dispose of the murder weapon. The trial court's finding that the conspiracy was still in existence was a reasonable inference from the evidence (*People* v. *Smith,* 63 Cal.2d 779, 794 [48 Cal.Rptr. 382, 409 P.2d 222]).

■ Appellant further contends that he was deprived of his rights to confrontation and cross-examination (*Pointer* v. *Texas,* 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065]; *Douglas* v. *Alabama,* 380 U.S. 415 [13 L. Ed.2d 934, 85 S.Ct. 1074]) by the admission of Givens' testimony concerning Brown's statement. If an extrajudicial statement is properly admitted under one of the exceptions to the hearsay rule, no violation of rights occurs (*People* v. *Glover,* 270 Cal.App.2d 255 [75 Cal.Rptr. 629]; *People* v. *Brawley,* 1 Cal.3d 277 [82 Cal.Rptr. 161, 461 P.2d 361]).

■ Finally, citing Penal Code section 1111, appellant contends that there was insufficient corroboration of Parrish's testimony concerning appellant's participation in the crime. Parrish was admittedly an accomplice. Thus, as the trial court properly instructed the jury, the corroborating evidence may be slight and entitled to little consideration when standing alone (*People* v. *Jones,* 254 Cal.App.2d 200, 213 [62 Cal.Rptr. 304]). Here, there is independent evidence that shortly after four young men entered a municipal bus, there was a shot, the bus lurched and the four young men departed rapidly by running up the hill. The bus driver was found shot and the coin changer missing. Shortly thereafter, appellant and the others proceeded to the home of Givens and one of them had a coin changer and gun. Possession of part of the loot and the murder weapon is proper and sufficient corroboration (*People* v. *Frankfort,* 114 Cal.App.2d 680, 692 [251 P.2d 401]) involving an association near the time of the offense (*People* v. *Henderson,* 34 Cal.2d 340, 343 [209 P.2d 785]). Appellant's reliance on *People* v. *Robinson,* 61 Cal.2d 373 [38 Cal.Rptr. 890, 392 P.2d 970], for the proposition that mere proof of association is insufficient, is not well placed, as in *Robinson* the evidence of association failed to connect the defendant with the perpetrators at any time near the commission of the offense. Here, the evidence connected appellant with the crime in such a way as to reasonably satisfy the jury that Parrish was telling the truth (*People* v. *Smith,* 4 Cal.App.3d 41 [84 Cal.Rptr. 229]; *People* v. *Ward,* 266 Cal.App.2d 241, 260 [72 Cal.Rptr. 46]).

The judgment and the juvenile court's transfer order are affirmed.

Shoemaker, P. J., and Kane, J., concurred.