[Crim. No. 33064. Second Dist., Div. Two. Dec. 5, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ROBERT DEHNEL, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and J. Courtney Shevelson, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FLEMING, J.**—Defendant Michael Robert Dehnel, in a joint trial with Tim Anderson and Dan Taylor, was convicted of conspiracy to commit murder. (Pen. Code, § 182, subd. 1.) We affirm.

FACTS

Officer Paul Gebhardt of the Los Angeles Police Department joined the Ku Klux Klan in October 1976 as part of an assignment to infiltrate and report on various right-wing organizations. He participated in many Klan activities, became an officer in the organization, and became affiliated with members of the Klan, among them defendant, Tim Anderson, and Dan Taylor.

In March 1977 a right-wing activist disappeared, and Klan members suspected the Jewish Defense League (JDL) of kidnaping the missing activist after the latter solicited a Jewish printer to print anti-Semitic literature. On March 29 Gebhardt, Anderson, and Taylor met at defendant's house with defendant and Ray Starcher, another Klansman. Defendant said he wanted to develop a plan to execute Irv Rubin, the West Coast coordinator of the JDL, and he announced that he would personally shoot anyone who foiled the plan. Defendant told Starcher to get a job at Rubin's business, which he thought was located in Van Nuys. (In fact, the Van Nuys business belonged to a different Irv Rubin, who had no affiliation with the JDL.) Defendant ordered Taylor to keep the Van Nuys business address under surveillance and take a picture of Rubin. He instructed Gebhardt to survey Rubin's residence, find the quickest escape route, and pinpoint the location of the nearest police station. Defendant asked Taylor if he could make a silencer for his .22 caliber survival rifle or .38 caliber two-inch revolver, and Taylor replied he believed he could machine the necessary parts. Subsequently, members of the group met several more times to discuss the best escape route and the manufacture of a silencer.

At one point Anderson suggested infiltration of the JDL as an alternative to the execution of Rubin. Defendant laughed at the idea, and thereafter no one dissented further from his plan. On several occasions Anderson and Taylor separately told Gebhardt they were hesistant about the plan and fearful of defendant, who had again threatened to kill anyone who failed to go along with his plan.

On April 4 Gebhardt drove his van with defendant and Anderson as passengers to the Van Nuys business location. On arrival, Gebhardt left the van to have breakfast with Taylor, who had driven there in his own vehicle. Defendant entered the business establishment and was immediately arrested by the police. Thereafter, Anderson was arrested while standing next to the van, and Gebhardt and Taylor were arrested on their return from breakfast. Inside the van the police found a telescopic sight Anderson had brought along to identify Rubin and a .38 caliber two-inch revolver belonging to defendant.

At trial, defendant's friends and acquaintances testified he was never serious in carrying out his plans, that he tended to fantasize and exaggerate his schemes and ideas without putting them into effect.

## Discussion

1. ■ Defendant contends the jury instructions requested by the prosecution on *duress* and *withdrawal from conspiracy* were not supported by the evidence, were misleading, and were confusing. We think these instructions were relevant to the cause, in that there was some evidence of reluctance on the part of the coconspirators to proceed with the murder conspiracy. Conceivably, the jury could have believed that the defendant's threats to his coconspirators constituted duress, and, conceivably, it could have believed that Anderson's attempt to substitute JDL infiltration for Rubin's execution constituted his withdrawal from the murder conspiracy. The instructions, therefore, served a legitimate purpose. But even if these instructions were irrelevant, the jury had been directed to disregard any instruction applicable to a state of facts which it found did not exist, and we must assume the jury followed such a cautionary instruction.

2. ■ Defendant argues the court erred in allowing Gebhardt to testify that Anderson told him that defendant's sister-in-law had said that defendant had "killed people before." The evidence was elicited by Anderson and admitted exclusively on his behalf to show his state of mind with respect to the defendant, and not to prove the truth of the assertion. (See Evid. Code, § 1200.) Indubitably, triple hearsay is of dubious value to prove any issue. Perhaps the better ruling of the trial court would have been to exclude it as inconsequential. However, the judge who presided at the trial had closer contact with the facts of the controversy and the relationship of the parties to one another than we do, and, since the evidence was technically admissible on behalf of a codefendant to show that codefendant's state of mind (i.e. that he was

afraid of defendant), the admission of reputation hearsay of this sort was perhaps justifiable. The court properly advised the jury that the evidence was admitted solely on Anderson's behalf, and we think this instruction on limited admissibility served to protect defendant from undue prejudice. (See *People v. Reeder* (1978) 82 Cal.App.3d 543, 555 [147 Cal.Rptr. 275].) Moreover, assuming error, in view of the overwhelming evidence of defendant's guilt, it is not reasonably probable that a result more favorable to defendant would have been reached if the statement had been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 830 [299 P.2d 243].)

3. ■ Defendant next contends the court erred in admitting photographs of a Ku Klux Klan rally depicting Anderson, Gebhardt, and other unknown persons, some armed, in white hooded robes standing near a burning cross. The photographs were admitted solely against Anderson and did not implicate defendant. As so limited their admission was proper. (Evid. Code, § 355.)

4. ■ Defendant further contends the court abused its discretion in sentencing defendant to state prison for life while granting probation with one year in the county jail to Anderson and granting a new trial to Taylor. Abuse of discretion does not necessarily occur when codefendants are given disparate sentences. (*People v. Paul* (1978) 78 Cal. App.3d 32, 49 [144 Cal.Rptr. 431].) Here, disparity in sentence was warranted, in that defendant was the instigator and moving force behind the murder conspiracy.

5. Finally, defendant contends he is entitled to good time/work time credit against his prison term in addition to the time of presentence custody credited him by the trial court. This contention is now pending in other cases before the Supreme Court, and we need not speculate on the ultimate holding of that court. Presumably, if such credits are awarded and regardless of the methodology adopted for their determination, all inmates will receive the benefit thereof, either administratively or by writ. *(People v. Wende* (1979) 25 Cal.3d 436, 443 [158 Cal.Rptr. 839, 600 P.2d 1071].)

The judgment is affirmed.

Roth, P. J., and Compton, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 30, 1980.