[Crim. No. 4257. Fifth Dist. June 12, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMMY SIMENTHAL DOMINGUEZ et al., Defendants and
Appellants.

COUNSEL

Allen R. Crown and Quin Denvir, State Public Defender, under appointments by the Court of Appeal, Stanley Kubochi and Richard L. Phillips, Deputy State Public Defenders, for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian; Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi and Maureen A. Daly, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ZENOVICH, J.**—Sammy Simenthal Dominguez and Anthony Castro were charged with having committed murder (Pen. Code, § 187) and an assault with a deadly weapon (Pen. Code, § 245, subd. (a)). In addition, it was alleged that Dominguez personally used a firearm within the meaning of Penal Code section 12022.5. It was further alleged that, in the commission of the murder, a principal was armed with a handgun (Pen. Code, § 12022, subd. (a)). With regard to the assault count, the information alleged that both defendants were armed with a handgun during the commission of the offense (Pen. Code, § 12022, subd. (a)).

Following a 22-day trial, the jury returned guilty verdicts and found the allegations alleged in the information to be true as to both defendants.[1] Dominguez was sentenced to state prison for a life term on the

---

[1]With regard to the first count of the information, Castro was found guilty of murder and was found to be armed with a firearm during its commission.

murder count and a two-year concurrent enhancement was imposed pursuant to Penal Code section 12022.5. Imposition of sentence on the assault count was stayed pending completion of the term for the murder count. Following completion of a court-ordered diagnostic report by the California Youth Authority, Castro was sentenced to a life term on the murder count and a one-year enhancement was imposed pursuant to Penal Code section 12022, subdivision (a). The five-year sentence on the assault count was stayed pending completion of the sentence on the murder count. They appeal.

## PROSECUTION TESTIMONY

In October 1977, appellants Sammy Dominguez and Anthony "Tonito" Castro, as well as one named David Hernandez, were members of the Nuestra Familia, an organized gang.[2] Hernandez described the Nuestra Familia as a rigid, militaristic organization in which members are required to follow orders and to remain loyal to the group under penalty of death. The group operates both within and outside of state prisons. Different regiments are scattered throughout California, headed by a lieutenant. The members are known as "soldiers." The constitution of the organization levies an automatic death sentence upon any member who turns coward, traitor or deserter.

On October 9, 1977, Hernandez was released from state prison and directed by the prison's Nuestra Familia lieutenant to make contact with certain individuals in Bakersfield. Hernandez was then put in contact with other individuals and made a trip to Fresno on October 13.[3] Hernandez met with several Nuestra Familia members in the Chinatown area, including Tonito Castro. A few days later, both Hernandez and Castro reported according to orders to the Salinas regiment of the Nuestra Familia.[4] While at a Salinas apartment headquarters of the Nuestra Familia, Hernandez was ordered to stay in Salinas. Hernandez noted that he saw Tonito at the apartment and met another organization member named Sammy Dominguez. Hernandez, Dominguez and Castro stayed at the Salinas apartment for a week and became a part of that particular regiment.

[2]Hernandez was given complete immunity in the municipal court for his testimony at this trial.

[3]Hernandez "was going to be in charge of collecting all the money that the prostitutes in Fresno made during the night."

[4]Although both Hernandez and Castro reported to the Salinas regiment, Hernandez testified that he made his trip from Fresno with an individual named Mackie Bacage.

Sometime during October 1977, Hernandez, Marina Christina "Chris" Cobos, Marian Saballa Maldonado, Marian Martinez, and Dominguez went to San Jose. They purchased a white station wagon and returned to Salinas. According to Mrs. Cobos, the car was purchased so that some Nuestra Familia "brothers" could "go back to their home town to report in to their parole officers."[5]

The lieutenant of the Salinas regiment was Arthur "T-Bone" Lasolla. Most of Lasolla's orders came from Death Row Joe Gonzales, one of the head leaders of the Nuestra Familia, who was in state prison at the time. On October 21, 1977, Lasolla ordered Hernandez to go to Bakersfield with Dominguez and Castro so that appellants could report to their parole officer. Lasolla provided Hernandez with two .22 revolvers and some ammunition. Lasolla instructed that, while in Bakersfield, the men were to commit a robbery and kill one named Chollo Hernandez, a dropout from the Nuestra Familia organization.[6] In addition, Lasolla indicated that the men should kill any enemies of the Nuestra Familia which they might encounter in Bakersfield. Hernandez, Dominguez, Castro and Anna Ruiz, Dominguez' girlfriend, departed Salinas later that day in the white station wagon purchased in San Jose. The group of individuals was carrying two revolvers and cartridges given to them by Lasolla.

The group arrived in Bakersfield at approximately 4:45 p.m.; Dominguez and Castro reported to their parole officer as ordered. Afterwards, the men took Anna Ruiz to her house. Next, Hernandez, Dominguez and Castro each visited their respective mothers.

The three men then got back together a few hours later. Castro informed Hernandez that Castro's brother, Manuel, knew where they could locate Chollo Hernandez. At some point, the three men picked up Manuel, and Dominguez drove to a house where Chollo could supposedly be found. The men were lying in wait to kill Chollo in the event of his arrival. Hernandez and Dominguez were armed with .22 revolvers. The men walked into the backyard of the house indicated to be the residence of Chollo. After ascertaining that Chollo was not there, the men returned to the car and took Manuel home.

---

[5]Cobos testified that she was living in the Salinas regiment.

[6]As indicated earlier, any deserters from the organization were subject to an automatic death sentence by current members of the Nuestra Familia.

The three men then drove to another location in Bakersfield and contacted Eugene Villarreal. The purpose behind this visit was to obtain a third gun so that each of the men would be armed during the planned robbery and so that each would be armed if they encountered Nuestra Familia enemies. Hernandez testified that Dominguez and Castro returned with a .38 handgun and cartridges.[7]

From Villarreal's residence, the three men drove to a liquor store across from a park on California and King Streets and purchased some beer. At the liquor store, Dominguez saw a friend, Alex Santa Cruz, and asked him if Steve "Wolfie" Fierro was with him. Alex responded, "Yeah," and departed from the liquor store to a party at another location. The Fierro brothers were known enemies of the Nuestra Familia. "Wolfie" Fierro was believed to be a sympathizer of the Mexican Mafia, a rival gang.

While Hernandez and appellants were purchasing liquor, Castro told Hernandez that he had information that the Fierro brothers often frequented the park across the street. Hernandez stated that the three men went to the park and waited for the Fierros' arrival in order to kill them. The trio did not see any of the Fierros; accordingly, they left the park around midnight.

As Hernandez and Castro were crossing the street to rejoin Dominguez who was near the station wagon parked behind the liquor store, a yellow car drove by and someone in the car hollered out "Tonito." As the three men looked toward the yellow car, someone fired a shot in their direction. Castro was "hit" in one of his fingers. Hernandez and Castro attempted to obtain the guns from the station wagon; Castro aimed the .38 out the window and emptied it in the yellow car as it sped away. Hernandez also fired at the vehicle once.[8] The three men gave pursuit, but lost the yellow car.

Castro hypothesized that the Fierros were the individuals in the yellow car who had shot at them, mentioning the name of "Wolfie"

---

[7]After being given immunity, Villarreal testified that Dominguez, Castro and Hernandez had come to his house earlier in the evening and asked for a gun. Villarreal said he obtained a .38 gun for them from Tony Perez, giving it to Dominguez and Castro when they returned to his house on a second occasion. Hernandez did not testify that he and appellants had visited Villarreal on an earlier occasion. Perez denied that Villarreal ever asked him for a gun and further denied ever giving a gun to Villarreal.

[8]Hernandez did testify that Dominguez did not fire any weapon on this occasion.

sometime during the conversation. The three men believed they had been attacked "by possible enemies of the Nuestra Familia" and considered it their duty "to kill [the Fierros] if possible." Castro said he knew where the Fierros "hung out." The three men traveled to and set up surveillance at a particular residence. The three men had guns and were prepared to "open fire" on the Fierros if they arrived. If they did not retaliate, Hernandez indicated they would be branded as cowards and killed by their gang. After a five- to twenty-minute interval, no one showed up at the residence, and Castro told the men about a place where they could obtain some more ammunition for the .38. The three men then returned to Villarreal's residence in an unsuccessful attempt to obtain more ammunition for the .38.

As they left Villarreal's house, Castro suggested that the group proceed up Virginia Street to "another place where he knew the Fierros might possibly be." When they turned onto Virginia Street, the three men saw a group of people talking and drinking beer near two parked cars. Among the group of people were Alex and Fred Santa Cruz, Steven Fierro and David Rodriguez.[9] As the white station wagon passed the group, Castro shouted excitedly that Wolfie was among the individuals outside. Dominguez made a U-turn and drove by the residence a second time. After a second U-turn, Dominguez stopped the car near the group of people and Castro asked whether Wolfie was there. Someone in the crowd gave a negative response.[10] Dominguez reached across Hernandez, who was in the front passenger seat, and fired two shots from a .22 revolver directly into the crowd. As Dominguez stopped the car and Hernandez began to depart from it, the group began to scatter. Hernandez responded by firing a .22 revolver at a person who had crawled underneath a nearby parked car. As he did so, Dominguez ran around to the front of the station wagon and resumed shooting. Hernandez also fired several shots at a person who was fleeing across a grassy area near the rear of the lot. Hernandez opined that the fleeing person "was trying to dodge bullets." Hernandez' victim screamed and hit the ground with a painful cry. Although Hernandez thought "Well, now, I have him," he pulled the trigger again, only to find that the weapon was empty. Hernandez noted that the person "didn't run any more," although Hernandez "could see him moving around." During the

[9]Alex Santa Cruz offered testimony in which he described how he and some friends went from the liquor store on California Street to a party at the house on Virginia Street. Santa Cruz admitted seeing the station wagon travel by the group on Virginia Street.

[10]Fred Santa Cruz testified that someone in the station wagon yelled "Wolfie" and that Steve Fierro responded, "Here I am."

shooting, Hernandez testified that Castro was located in between two cars and was repeatedly yelling, "This is the N.F. This is the N.F."

When the shooting started, Fred and Alex Santa Cruz and Steve Fierro ducked behind David Rodriguez' car. Steve Fierro told Fred Santa Cruz that he had been shot. Wolfie left Fred Santa Cruz' presence, and Fred crawled underneath a car. Alex Santa Cruz suffered a gunshot wound to his right leg while "doing somersaults and doing flips to try to avoid being hit" in a nearby grassy, open lot. Wolfie Fierro was found unconscious next to the house at 1923 Virginia Street. Wolfie subsequently died; a post mortem examination showed that his death was caused by a .22 projectile which perforated his aorta.

After Hernandez discovered that his ammunition was expended, he shouted, "Let's go" to Dominguez and Castro. The three men ran back to the car and sped away. After traveling for a short distance, the station wagon came to a stop; Hernandez and appellants wiped fingerprints off of the car and the guns. The men unsuccessfully attempted to recover some ammunition from an area near the spare tire.

By foot, the three men attempted to obtain more ammunition from Dominguez' uncle, who had a residence near the area of the shooting. They were unsuccessful in this attempt. The men returned to the station wagon and traveled to Villarreal's residence. Hernandez said that he waited in the car while Dominguez and Castro attempted to "coax [Villarreal] into giving [them] some ammunition." Villarreal said that Dominguez and Castro excitedly told him about "dropp[ing] a card" and about shooting at some people who were standing in front of a house. Both Dominguez and Castro reported seeing someone "drop" during the shooting.[11] At the request of both appellants, Villarreal entered the station wagon and agreed to accompany the three men for purposes of obtaining more ammunition for the .38.

At 1:25 a.m., Bakersfield Police Officers Record and Parker received a broadcast which included a description of a white station wagon wanted in connection with an attempted murder. Immediately there-

---

[11]Although initially stating that both appellants made the statement, Villarreal clarified that it was only Dominguez who actually said "they had dropped a card and they had got them good and he had seen one of them drop." Subsequently, however, Villarreal said that both appellants remembered seeing someone drop at the scene of the shooting.

after, the officers observed a similar vehicle at a nearby intersection. The officers followed the car for a short time and soon activated the red light on their patrol car. Dominguez stepped on the gas and began to accelerate from the police vehicle. The officers activated a siren and continued pursuit. As Dominguez made a right-hand turn onto Ninth Street, the station wagon slid out of control, hit a fence, and eventually stopped. Hernandez exited out of the right front passenger door, pointed a gun toward the police, and ran from the scene. He threw his gun away during the flight and managed to escape police pursuit by obtaining refuge in the nearby house of Raymond Briseno, a Nuestra Familia member. Dominguez was arrested after being found underneath the station wagon. Villarreal and Castro escaped by jumping over fences and running through nearby yards. Castro and Hernandez went to the Fresno regiment the day after the shooting. Hernandez was subsequently arrested in Hayward on November 2, and Castro was apparently arrested sometime after the shooting.

## DEFENSE TESTIMONY

Castro's defense was primarily one of mistaken identity. He initially showed that Officer Parker, one of the responding policemen, identified one named Freddie Fuentes as the person who exited the right front portion of the station wagon after it slid out of control.[12] Fuentes was arrested as a suspect, although he was eventually released. A criminalist examining Fuentes on October 22 at 4:30 a.m. found gunpower particles on his hands and certain items of clothing. Castro also presented evidence showing that he was in custody at juvenile hall on October 16 and made an appearance at a court proceeding on October 25. Nonetheless, this evidence did not establish that he was in custody between those dates.

Dominguez rested on the evidence presented by the People. In closing argument, his attorney urged that jurors could not find beyond a reasonable doubt that Dominguez was the one who killed Wolfie or wounded Santa Cruz. Dominguez' counsel also argued that his client was guilty of no more than voluntary manslaughter.

---

[12]Officer Parker made his identification of Fuentes from photographs and photographic lineups. In addition, Alex Santa Cruz testified that Freddie Fuentes was present at the party where the shooting occurred.

DOMINGUEZ' APPEAL

I

 Dominguez initially contends that the lower court erred in failing to exclude appellant Castro's extrajudicial statements to Hernandez because they were prejudicial hearsay statements not within the coconspirator exception to the hearsay rule. We are not persuaded; however, before giving our reasons, we believe it important to reexamine the challenged testimony.

As noted earlier, David Hernandez was told to accompany Dominguez and Castro to Bakersfield and was given three orders to carry out. Testimony showed that Nuestra Familia members were under an obligation to kill enemies of the gang or face the possibility of death by the Nuestra Familia.[13] One of Hernandez' orders was to kill any Nuestra Familia enemies which he and appellants might encounter while in Bakersfield. The three men also became obliged to kill the Fierros after the attack upon them outside of the liquor store. Following the shooting near the Virginia Street residence, Hernandez took refuge in the home of Raymond Briseno, a Nuestra Familia member. On the day after the shooting, Castro went to the Briseno residence and Hernandez asked him to relate his version of what had transpired at the Virginia Street residence. Hernandez asked for Castro's account because "as a squad leader I was obligated to get all the available information of what had happened so I could in turn inform my lieutenant." Testimony by Cobos revealed that transmission of the details of the killing was a prerequisite to earning a "star" within the Nuestra Familia. Over defense objection that Castro's statements were hearsay as to appellant Dominguez, Hernandez testified that Castro told him that while they were at the house where Wolfie was shot, Castro observed Dominguez firing at a person who was crawling up a driveway on his hands and knees. Hernandez also said that Castro said that the person in the driveway was Wolfie. Hernandez reported the information from Castro, as well as other information about the shooting, to Salinas Lieutenant Lasolla. Hernandez said that he was required to report such activities to Lasolla. Before allowing introduction of this evidence, the trial court extensively

---

[13]Hernandez testified that the three men might be branded as cowards and killed if they did not retaliate against the Fierros after the Fierros had shot at them. Similarly, Marina Cobos, a Nuestra Familia member acquainted with appellants, testified that gang members killing an enemy earned a "star," which represented respect and recognition within the Nuestra Familia organizaton.

admonished jurors that Castro's statements were inadmissible hearsay as to Dominguez unless it was found that the statement was made by Castro in the furtherance of a conspiracy. The court also admonished that the evidence should not be considered against Dominguez if no conspiracy was found.[14]

Appellant argues that these statements were made after the attainment of the objectives of any conspiracy between Hernandez, Castro and Dominguez. The People argue that there was a "continuing" conspiracy until information about the shootings was relayed to Salinas Lieutenant Lasolla.

■ The relevant appellate principles were articulated by our Supreme Court in the following passage from *People v. Saling* (1972) 7 Cal.3d 844, 852 [103 Cal.Rptr. 698, 500 P.2d 610]: "It is for the trier of fact—considering the unique circumstances and the nature and purpose of the conspiracy of each case—to determine precisely when the conspiracy has ended. [Citations.] Particular circumstances may well disclose a situation where the conspiracy will be deemed to have extended beyond the substantive crime to activities contemplated and undertaken by the conspirators in pursuance of the objectives of the conspiracy. [Citations.]" (Accord *People v. McFarland* (1971) 17 Cal. App.3d 807, 822-823 [95 Cal.Rptr. 369], questioned on another point in *Bryan v. Superior Court* (1972) 7 Cal.3d 575, 582-583, fn. 6 [102 Cal.Rptr. 831, 498 P.2d 1079].) ■ Applying the above principles, we believe that the jurors could rationally infer that there was a "continuing" conspiracy when Castro made his statements to Hernandez.

Although a "continuing" conspiracy is not probable in some situations (see *People v. Pic'l* (1981) 114 Cal.App.3d 824, 886 [171 Cal.Rptr. 106] (subsequent to the arrest of one of the principal coconspirators); *People v. Saling, supra,* 7 Cal.3d at pp. 853-854 (statements involving concealment after the objective of the conspiracy has been fulfilled)), the present circumstances show otherwise. The People cogently note that the evidence established the existence of a conspiracy among Hernandez, Castro and Dominguez to kill one of the Fierros in order to promote their own interests within the Nuestra Familia. Evidence from Cobos and other witnesses established that Hernandez and appellants had to kill the Fierros in order to avoid punishment in the Nuestra

---

[14]We note that none of the jurors raised their hands when the court asked if they needed clarification in regard to its admonition.

Familia or, in the alternative, to earn a recognition "star" for purposes of gaining status within the organization. Hernandez had to get information from Castro so that he could accurately relay a synopsis of the shooting incident to Lieutenant Lasolla. Under these circumstances, we believe the jurors were justified in concluding that the subsequent conversation between Hernandez and Castro was in furtherance of the gang-related purposes of the conspiracy to kill the Fierros and other enemies of the Nuestra Familia. Thus, since Castro's statements were admissible under the coconspirator exception, there was no confrontation or *Aranda* (*People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]) violation. (See *People v. McFarland, supra,* 17 Cal.App.3d 807, 823; *People v. Morales* (1968) 263 Cal.App.2d 368, 374 [69 Cal.Rptr. 402], cert. den. (1969) 393 U.S. 1104 [2 L.Ed.2d 798, 89 S.Ct. 907].)[15]

Dominguez' reliance on *People v. Leach* (1975) 15 Cal.3d 419 [124 Cal.Rptr. 752, 541 P.2d 296] (cert. den. *sub nom., Kramer v. California* (1976) 424 U.S. 926 [47 L.Ed.2d 335, 96 S.Ct. 1137]) is misplaced. In *Leach,* there was no independent evidence of the existence of a "continuing" conspiracy to justify the admission of some statements under the coconspirator exception to the hearsay rule. (*Id.,* at pp. 432-435.)[16] Unlike *Leach* and more akin to *Saling* (see *Leach, supra,* at p. 432), there was independent testimony from Hernandez, Cobos and Villarreal which established that the Fierro killing was gang-motivated and that communication of the incident was essential to achieve recognition in and avoid punishment within the Nuestra Familia. We believe this makes *Leach* inapposite to the instant case.

Moreover, even if the evidence was not admissible under the coconspirator exception, we believe its introduction at trial was not prejudicial to Dominguez. Castro's statements were merely cumulative of other testimony establishing Dominguez' participation in the shoot-

---

[15]Recently, a persuasive body of authority has cogently recognized that the coconspirator exception to the hearsay rule does not violate a defendant's right to confront and cross-examine witnesses. (*Dutton v. Evans* (1970) 400 U.S. 74, 81-83 [27 L.Ed.2d 213, 222-224, 91 S.Ct. 210]; *People v. Brawley* (1969) 1 Cal.3d 277, 288-291 [82 Cal.Rptr. 161, 461 P.2d 361], cert. den. *sub nom., Baker v. California* (1971) 400 U.S. 993 [27 L.Ed.2d 441, 91 S.Ct. 462]; *People v. Pic'l, supra,* 114 Cal.App.3d 824, 875-877.)

[16]In particular, the *Leach* court concluded that "The objective of the conspiracy was to kill Howard Kramer, not to collect insurance, and Leach cared not a whit whence his remuneration came, be it by insurance fraud, bank robbery, or dope peddling." (*People v. Leach, supra,* 15 Cal.3d at p. 435.)

ing. For example, Villarreal testified that Dominguez told him after the shooting about dropping a "card." In addition, the trial court gave an oral admonition and closing instructions[17] to the jury which carefully limited application of the evidence pursuant to the coconspirator exception. This admonition and subsequent instructions adequately protected Dominguez from undue prejudice. (Cf. *People v. Dehnel* (1979) 99 Cal.App.3d 404, 408-409 [160 Cal.Rptr. 279].) Finally, we believe the admission of Castro's statements was harmless in light of the overwhelming evidence which placed Dominguez at the scene of the shooting and which implicated him in the killing of Wolfie. (Cf. *People v. Leach, supra*, 15 Cal.3d at pp. 445-446; *People v. Pic'l, supra*, 114 Cal.App.3d at p. 896.)

## II

■ Dominguez next contends that the trial judge abused his discretion when he refused to bar evidence on the criminal purposes of the Nuestra Familia on the ground that it was unduly prejudicial.[18] (Evid. Code, § 352.) In the alternative, Dominguez argues that he was denied due process because such evidence might tempt the jury to find him guilty due to his association with the gang. The People argue that the evidence had probative force as far as showing Dominguez' motive for shooting at Wolfie.

We initially set forth the segments of testimony pertinent to Dominguez' second contention.

Cobos, a former message carrier for the Nuestra Familia, described her duties and revealed the names of the superiors to whom she reported. Cobos said that she carried orders to subordinate gang members to get involved with "hits, prostitutions, drugs, anything that would bring in some money to the organization." She also carried information to su-

---

[17]The court gave comprehensive instructions on the law of conspiracy. In particular, the judge instructed jurors that "No act or declaration of a conspirator that is committed or made after the conspiracy has been terminated is binding upon his coconspirators, and they are not criminally liable. for any such act." (CALJIC No. 6.21.)

[18]We note that during voir dire examination the jury panel was asked about their knowledge of Mexican gangs known as the Nuestra Familia and the Mexican Mafia. Further, inquiry was made as to whether any of them had read articles concerning law enforcement problems with gang warfare among the Mexican American people. Two jurors indicated they would be biased and were excused for cause. None of the other jurors indicated they would convict because of their feelings regarding the gang problem or because of any criminal aura surrounding Nuestra Familia activities.

periors about "how many brothers we have in a regiment and how many robberies they did, how much money we had in the banks." At a later point, defense counsel moved to strike the testimony, and this motion was denied.[19]

Hernandez also testified about the obligations and responsibilities of Nuestra Familia members. He indicated that members frequently "buy services of different convicts that have job assignments where we might need them" and that new arrivals in the gang "are also taught how to make weapons within the prison." Over defense counsel's objection pursuant to Evidence Code section 352, Hernandez testified that some of the street activities of the Nuestra Familia include "robbery, sales of drugs, prostitution, extortion, contracts, meaning someone pays you to kill someone."

In arguing that the court abused its discretion under Evidence Code section 352,[20] Dominguez contends that the prejudicial evidence about Nuestra Familia activities outweighed its probative value in proving a motive for the killing. We disagree; the evidence was relevant on the issue of motive and the trial court astutely guarded against allowing tangential evidence of a prejudicial nature to be introduced into the trial proceeding.

Although conceding that "some evidence of the gang's tenets as contained in their constitution was admissible to show intent and motive," Dominguez argues that "motive could have been established without reference to the gang's other, non-related, criminal endeavors." Not so. In our opinion, this argument fails to demonstrate how motive could have been proved without showing that the Nuestra Familia engaged in criminal and violent acts and that members were obligated to commit such acts under penalty of their own lives. Since this evidence on motive logically and naturally aided the People in rebutting the presumption of innocence and showing a reason for Dominguez' criminal behavior, it cannot be said the trial judge erred in concluding that its probative val-

---

[19]Technically, defense counsel's motion to strike was untimely, since the evidence had already been admitted into trial without objection. Nonetheless, since Dominguez also challenges the testimony of Hernandez, the present contention is preserved for appellate review.

[20]The People correctly note that the evidence relating to gang membership is different than the "criminal propensity" character evidence prohibited by Evidence Code section 1101, subdivision (a). Instead, the evidence about the criminal purposes of the Nuestra Familia was relevant to prove the *motive* for the shooting of Wolfie Fierro. (Evid. Code, § 1101, subd. (b).)

ue exceeded its prejudicial effect. (*People* v. *Guerrero* (1976) 16 Cal.3d 719, 724 [129 Cal.Rptr. 166, 548 P.2d 366]; *People* v. *Schader* (1969) 71 Cal.2d 761, 775 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Lopez* (1969) 1 Cal.App.3d 78, 85 [81 Cal.Rptr. 386]; *People* v. *Miller* (1960) 185 Cal.App.2d 59, 71 [8 Cal.Rptr. 91].)

The determination that the evidence relating to the Nuestra Familia was admissible finds support in the case of *People* v. *Beyea* (1974) 38 Cal.App.3d 176 [113 Cal.Rptr. 254]. In *Beyea*, the trial court denied defendants' motion to exclude evidence of their membership in the Hell's Angels group. Although the defendants alleged that the evidence would have an inflammatory effect on the jury, the court determined that membership would be admissible to prove their identity and motive. The appellate court agreed stating, "As proof of the defendants' membership in the Hell's Angels was relevant to proof of motive and was material and necessary, we cannot say that the trial court erred in concluding that the evidence's probative value outweighed its prejudicial effect." (*Id.*, at p. 195.) Since evidence about the criminal purposes of the Nuestra Familia was similarly relevant in the instant case, *Beyea* shows why the trial judge here was justified in allowing its introduction at trial.

No contrary result is dictated by the recent decision of *People* v. *Perez* (1981) 114 Cal.App.3d 470 [170 Cal.Rptr. 619] (hg. den. Mar. 11, 1981). Although that court concluded that evidence about membership in the Compton Varrios Tres gang was too prejudicial, a careful reading of *Perez* shows that the court did not find the evidence probative on the issues of motive or intent. (*Id.*, at pp. 477-478.) Furthermore, the *Perez* court noted, "The record does not show that the trial court did in fact discharge its duty in these circumstances by weighing the evidence for prejudice against its probative value. It simply ruled that the evidence was relevant to either identity, knowledge, or credibility." (*Id.*, at p. 478.) In the instant case, evidence of the Nuestra Familia's criminal purposes was critically necessary to show why Dominguez was motivated to engage in the activities which led to Wolfie's death. Moreover, unlike the situation in *Perez*, the court below took careful pains to note that it would not allow wholesale introduction of unrelated criminal activities of the Nuestra Familia.[21] For these reasons, we find *Perez* inapposite to the present circumstances.

---

[21]The trial court specifically stated, "Although I felt at first the drugs and prostitution should be left out I think you can certainly show, like you say, it is a criminal

The lower court did not abuse its discretion by admitting limited evidence about the Nuestra Familia's criminal purposes. (*People* v. *Love* (1977) 75 Cal.App.3d 928, 933 [142 Cal.Rptr. 532].)

Even if the evidence should have been excluded, its admission was harmless in the present case. Dominguez was clearly placed at the scene of the killing. Furthermore, the venire panel (from which the jury was selected) indicated it would not find defendants guilty because of their Nuestra Familia ties. These circumstances undercut any sound basis for a finding of prejudice.

As a subsidiary contention, Dominguez argues that he was denied due process because the evidence about the Nuestra Familia might have caused jurors to find him "guilty by association."[22] We are not persuaded.

Dominguez cites *People* v. *Chambers* (1964) 231 Cal.App.2d 23 [41 Cal.Rptr. 551] and *People* v. *Jackson* (1967) 254 Cal.App.2d 655 [62 Cal.Rptr. 208] in support of his proposition. An examination of these cases shows that their factual situations are quite divergent from the present one. In both *Chambers* and *Jackson*, the prosecution introduced a large quantum of evidence which dealt with crimes committed by co-defendants and unconnected to acts undertaken by the respective defendants. (*Chambers, supra,* at pp. 28-29; *Jackson, supra,* at pp. 656-657.) These cases are inapropos to the present one, since the evidence related to activities of a gang to which appellant had pledged his loyalty. The amount of testimony devoted to Dominguez' participation in gang activities made it unlikely that jurors found him "guilty by association."

The trial court's instructions to jurors—that evidence of association alone does not prove membership in a conspiracy and that the case must be separately considered as to each defendant (CALJIC. Nos. 6.13, 6.22)—also made it unlikely that jurors convicted Dominguez be-

---

organization and not just a church group meeting on Sunday, but I don't want to get in, for instance, all sorts of crimes and I don't think you planned that. That's ridiculous." The district attorney agreed with this assessment. The court then noted, "They are only being tried for this one crime, not all the other crimes that the Nuestra Familia might have done. All right, I will still overrule the objection because it does tend to show it is a criminal organization."

[22]Or, as Chaucer would have said, guilty because of his membership in the "Parliament of Fowles."

cause of his association with the Nuestra Familia. The cumulative testimony of eyewitnesses provided a solid base for finding Dominguez guilty; the jury did not have to resort to a conviction based upon guilt by association.

### III

On several occasions at the trial, Cobos testified about the manner in which the Nuestra Familia assured that their members on parole reported to parole officers. In addition, Hernandez testified that he was ordered, among other things, to accompany Dominguez and Castro to Bakersfield so that they could report to their parole officer. The trial court denied defense counsel's oral motion to exclude references to the "probation" or "parole" officer. In addition, the court denied counsel's motion for mistrial with regard to a certain portion of Cobos' testimony.

Appellant now contends that the evidence about his parole status was irrelevant to the case and was tantamount to introduction of "criminal propensity" character evidence banned by Evidence Code section 1101, subdivision (a). We disagree. This evidence was relevant because (1) it explained the presence of the three men in Bakersfield on October 21, and (2) it showed that the men dutifully followed the orders given by Nuestra Familia superiors. Furthermore, given the other substantial evidence pointing to Dominguez' identity as a participant in the shooting, it is not reasonably probable that he would have obtained a more favorable result had the remarks about his parole status not been made. (*People* v. *Williams* (1981) 115 Cal.App.3d 446, 453 [171 Cal.Rptr. 401]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Also at the trial, Colleen Farr, owner of the Country Cousin's Sporting Goods in Watsonville (near the Salinas area), testified that the two .22 weapons used at the Virginia Street shooting had been stolen from her store on September 7, 1977. This testimony was introduced over defense objection. The trial court admitted Farr's testimony under Evidence Code section 352.

Because the theft of the guns from the Watsonville store cannot be conclusively attributed to the Nuestra Familia or either of the appellants, Dominguez argues that the testimony was "totally irrelevant" and that "the jury would more easily believe they are murderers also ... having learned appellants might be thieves, ..." The People argue that

the evidence was relevant (1) as corroboration of Hernandez' testimony about the three men being sent to Bakersfield with guns obtained from the Salinas area, and (2) as independent proof that the weapons had originated from the Salinas area six weeks prior to their recovery from an area near the Virginia Street residence.

Although there was no solid proof that the Nuestra Familia stole the guns, evidence that the guns came from the Salinas area did corroborate Hernandez' testimony regarding the origin of the weapons. Moreover, since the .22 weapons in question were respectively found in the white station wagon and a flower bed near the Virginia Street residence, Farr's testimony independently established that the guns came from the Salinas area and tended to materially negate any claim that the guns could have come from another location. To this extent, we believe the evidence did aid jurors in identifying appellants (who traveled to Bakersfield from the Salinas regiment) as the individuals who did the shooting on October 21. Given the diverse testimony about the two .22 weapons, it cannot be said that the trial judge abused his discretion in admitting Farr's testimony; the evidence corroborated Hernandez' prior testimony and was independent proof of the origin of the guns.

Moreover, the solid and credible evidence against Dominguez made it unlikely that a more favorable result would have been achieved had the testimony been excluded.

CASTRO'S APPEAL

I

■ Pursuant to Penal Code section 995, Castro pursued a pretrial motion in which he claimed that the assault count of the information must be set aside. The basis of this motion was that the trial court was obligated to suspend criminal proceedings and refer the matter to juvenile court if appellant was found to be a minor. (See Welf. & Inst. Code, § 604.) This motion was denied by the judge hearing the section 995 motion. Appellant claims that this determination was erroneous, since the court hearing the criminal charges should have referred him for a juvenile court fitness hearing before proceeding on the assault count. The facts necessary for a resolution of this contention are as follows.[23]

---

[23]Appellant has not augmented the appellate court record to reflect any previous disposition by juvenile court judges. The facts to be recited are taken from the transcript of oral arguments on the section 995 motion.

The prosecuting attorney indicated that Castro had been found unfit to be tried as a juvenile on the murder count pursuant to Welfare and Institutions Code section 707. The prosecutor then asserted that, following the juvenile court fitness determination, a complaint was filed charging Castro with both the murder and assault counts. Before the superior court hearing the section 995 motion, appellant's trial counsel said he had previously objected to the municipal court's assertion of jurisdiction on the assault count. Counsel represented that he argued that Castro was entitled to a second fitness hearing under Welfare and Institutions Code section 707 and that the municipal court was compelled to suspend criminal proceedings pursuant to section 604. According to counsel, the municipal court overruled this objection.

The gist of Castro's present contention is that the superior court erred in determining that the municipal court had jurisdiction to proceed on the assault count without referring the matter back for a second fitness hearing before the juvenile court. We are not persuaded for the following reasons.

At the outset, we believe Castro is barred from pursuing his first contention because of his failure to provide an adequate appellate record. He has failed to provide either a clerk's transcript or reporter's transcript of the juvenile court's ruling at the first fitness hearing which dealt with the murder count. The only pertinent facts can be drawn from the assertions of the respective parties at oral argument on the section 995 motion. Such a record is deficient and hampers intelligent appellate review.

However, despite the inadequacy of the record, we believe Castro's initial contention lacks merit. A determination of fitness on the murder count effectively transferred jurisdiction to the superior court pending the filing of a complaint by prosecuting authorities. (Welf. & Inst. Code, §§ 707, 707.1.) From this point onward, the rules applicable toward criminal cases were operative. In the instant case, joinder of the murder and assault charges was necessary in order to avoid the prohibition against multiple prosecution. (See Pen. Code, § 954; *People v. Flint* (1975) 51 Cal.App.3d 333, 336 [124 Cal.Rptr. 269]; cf. *People v. Savala* (1981) 116 Cal.App.3d 41, 50 [171 Cal.Rptr. 882].) This means that the fitness determination on the murder count affected a jurisdictional transfer of the cause to superior court, where prosecuting authorities were free to join any connected charges. Under these circumstances, the municipal court was not required to suspend pro-

ceedings pursuant to Welfare and Institutions Code section 604 so that the juvenile court could hold a second fitness hearing on the assault charge. Accordingly, it was not erroneous for the superior court to deny Castro's section 995 motion.

## II

Castro then contends that the trial judge erroneously allowed the People to introduce taped jail conversations between appellant Dominguez and Dominguez' mother, since certain statements in the conversations tended to inculpate him. He makes two subsidiary contentions in this regard: (1) introduction of the taped statements violated Dominguez' state constitutional right to privacy, and (2) admission of the conversations violated *his* rights to confront and cross-examine witnesses. Before addressing these contentions, we believe the relevant facts should be set forth.

Following Dominguez' arrest and while he was in custody at the Kern County jail, two conversations between Dominguez and his mother on an internal jail telephone were taped by jail personnel.[24] Outside of jurors' presence, trial counsel for Dominguez claimed that introduction of the tapes would violate Dominguez' privacy rights and infringe upon his client's confrontation rights. Castro's counsel had no objection to introduction of the October 22 conversation, although he did object to those portions of the October 28 conversations which referred to Castro. The court ruled that the tapes were admissible, although irrelevant portions were deleted before presentation to jurors. With regard to Dominguez' references to Castro in the tapes, the court ruled, "I think they have admissibility against Sammy Dominguez to show he knows Tonito and none of them accuse Tonito of anything." The court further ruled that several references to Tonito could be introduced because they were not substantially incriminating. In addition, the trial court informed the parties that, "I will have to instruct [jurors] that [references to Castro apply] only to Mr. Dominguez' statements and not to Tonito." At a subsequent point in the record, the trial court did instruct the jury that "these jail tapes of course were the voice of Sammy Dominguez and apply only to Sammy Dominguez." We now address appellant's separate contentions.

We believe Castro's first contention as to the taped conversations is without merit for the following reasons.

---

[24]The respective conversations occurred on October 22 and 28, 1977.

First, Castro does not demonstrate why he should be able to derivatively defend the rights of privacy possessed by Dominguez. No exact legal authority has been found on this point, although the courts have allowed derivative standing for purposes of suppressing evidence (*Kaplan v. Superior Court* (1971) 6 Cal.3d 150, 153 [98 Cal.Rptr. 649, 491 P.2d 1], app. dism. (1972) 407 U.S. 917 [32 L.Ed.2d 803, 92 S.Ct. 2452]; *People v. Martin* (1955) 45 Cal.2d 755, 761 [290 P.2d 855]) and disallowed derivative standing for purposes of asserting "knock-notice" requirements (*People v. Cook* (1977) 69 Cal.App.3d 686, 690 [138 Cal.Rptr. 263]). (See discussion in *People v. Hackett* (1981) 115 Cal.App.3d 592, 595-598 [171 Cal.Rptr. 320].) Since the privacy rights asserted here are personal to Dominguez and differ from the in rem nature of suppression proceedings (*People v. Gale* (1973) 9 Cal.3d 788, 793 [108 Cal.Rptr. 852, 511 P.2d 1204]), we conclude Castro has no standing to assert this contention before us.

Second, Castro's contention is flawed on the merits. A long line of cases has established that there is no reasonable expectation of privacy in ordinary jailhouse conversations (*People v. Hill* (1974) 12 Cal.3d 731, 764-765 [117 Cal.Rptr. 393, 528 P.2d 1], disapproved on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 896, fn. 5 [135 Cal.Rptr. 786, 558 P.2d 872]; *North v. Superior Court* (1972) 8 Cal.3d 301, 308-309 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155]; *People v. Rodriguez* (1981) 117 Cal.App.3d 706, 713-716 [173 Cal. Rptr. 82]) unless an attorney consults with the defendant in a room designed for that purpose (*People v. Lopez* (1963) 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16], cert. den. (1964) 375 U.S. 994 [11 L.Ed.2d 480, 84 S.Ct. 634]), or unless a defendant is lulled into believing that his jailhouse conversations will be private (*People v. Hill, supra,* 12 Cal.3d at pp. 764-765). Although our Supreme Court is presently considering cases involving the privacy rights of jail inmates (*People v. Maxie* (Cal.App.) (hg. granted July 16, 1980); *Robinson v. Superior Court* (Cal.App.) (hg. granted June 25, 1980); *De Lancie v. Superior Court* (Cal.App.) (hg. granted Nov. 29, 1979)), there is cogent authority for the proposition that jailhouse monitoring does not infringe the privacy rights specified by the California Constitution. (*People v. Owens* (1980) 112 Cal.App.3d 441, 448-449 [112 Cal.Rptr. 441, 169 Cal.Rptr. 359]; *People v. Estrada* (1979) 93 Cal.App.3d 76, 98-99 [155 Cal.Rptr. 731]; see also *People v. Penrod* (1980) 112 Cal. App.3d 738, 749-750 [169 Cal.Rptr. 533].) Since no reasonable expectation of privacy exists in jail telephone conversations and the

conversations did not fall within the *Lopez* or *North* exceptions, we conclude Castro cannot prevail on this argument.

We likewise believe that Castro cannot prevail on his confrontation and cross-examination rights argument. (See *Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *People* v. *Aranda, supra*, 63 Cal.2d 518.)[25]

First, Castro has failed to show that Dominguez' extrajudicial statements[26] substantially inculpated or incriminated him. As stated cogently in *People v. Epps* (1973) 34 Cal.App.3d 146, 157 [109 Cal.Rptr. 733], "... it is [not] *Bruton* or *Aranda* error to admit in evidence the admission or confession of one defendant, which reflects his commission of a crime that is revealed by the physical evidence, because it might reflect on the issue of whether or not a crime was actually committed by not only the declarant but also by another, whom evidence, other than the confession, links to the declarant's activities." The *Epps* court concluded that a defendant's statements which did not directly inculpate or refer to his codefendant were not substantially incriminating to the nondeclarant defendant in light of other evidence showing that the two men were acquainted with each other. (*Id.*, at pp. 156-158.) As in *Epps*, testimony by numerous witnesses (such as Cobos and Hernandez) establishes that Dominguez and Castro were acquaintances and brothers in the Nuestra Familia. We thus conclude that Dominguez' statements about Castro were not substantially incriminating within the meaning of *Bruton* or *Aranda*.[27]

---

[25]We reject the People's argument that Castro has waived assertion of the *Bruton/Aranda* issue because he did not move for a severance prior to trial. Careful examination of the record shows that Castro's trial counsel objected to admission of the taped conversations and specifically requested deletion of the references to his client which were subsequently played before jurors. Although he did not move for a severance, Castro properly preserved assertion of the confrontation issue by entering a timely objection and a timely request for excisions/deletions. (See *People v. McGautha* (1969) 70 Cal.2d 770, 785 [76 Cal.Rptr. 434, 452 P.2d 650], affd. on defendant McGautha's petn. for cert., *sub nom., McGautha v. California* (1971) 402 U.S. 183, 186 [28 L.Ed.2d 711, 714, 91 S.Ct. 1454].)

[26]The challenged statements dealt with Dominguez' inquiries to his mother about Castro's whereabouts since his arrest and about Castro's failure to contact him.

[27]No contrary result is dictated by the recent case of *People v. Fulks* (1980) 110 Cal.App.3d 609 [168 Cal.Rptr. 203]. In invalidating the admission of various extrajudicial statements under *Bruton/Aranda* principles, the appellate court noted under its factual circumstances that "the statements were not offered for the purpose of being added to otherwise admissible evidence, *but for the sole purpose of being improperly played off against each other so as to demonstrate the collective consciousness of guilt*

Second, any erroneous introduction of the references to Castro was nonprejudicial. Overwhelming evidence independent of the references in the taped conversations showed the joint participation of Dominguez and Castro. Furthermore, the court gave a strong admonition to jurors to limit use of this evidence to Dominguez. Under these circumstances, any error was harmless beyond a reasonable doubt. (*Harrington* v. *California* (1969) 395 U.S. 250, 254 [23 L.Ed.2d 284, 287-288, 89 S.Ct. 1726]; *People* v. *Epps, supra,* 34 Cal.App.3d at pp. 160-161; *People* v. *Martin* (1971) 17 Cal.App.3d 661, 669 [95 Cal.Rptr. 250].)

### III

 Castro then contends that it was an abuse of discretion to deny his motion for a mistrial because witness Cobos' testimony about statements made to her by appellant Dominguez substantially incriminated him.

During questioning by the prosecutor, witness Cobos related the following as part of a conversation she earlier had with appellant Dominguez:

"Q. Now with respect to talking to or saying anything to you with respect to how the car was lost what did he say?

"A. They just said they had a shoot out with police officers.

"Q. What did he say in that regard? I want you to try to zero in on his words as much as you can so that we are hearing what he said at that time?

"A. It was just him and Tonito that were in the car and they had a shoot out with the police officers and the car spun around and Tonito got away but some innocent fool—" Over defense objection, the court denied Castro's motion for mistrial, although sustaining the objection as to Castro and admonishing jurors that Dominguez' statement was not admissible as to Castro.

---

*of the three defendants.*" (*Id.*, at p. 617, italics added.) Furthermore, the court found the introduction of such statements to be error in light of the weakness of the prosecution case. (*Id.*, at p. 618.) A situation similar to the one condemned in *Fulks* is not present here—the statements were merely cumulative of other evidence showing that Dominguez and Castro knew each other and, in any event, were not prejudicial to Castro.

 It is not an abuse of discretion when a trial court denies a motion for mistrial after being satisfied that no injustice has resulted or will result from the occurrences of which complaint is made. (*People* v. *Romero* (1977) 68 Cal.App.3d 543, 548 [137 Cal.Rptr. 675].) Furthermore, "A motion for a mistrial presupposes that the effect of the objectionable evidence 'is so prejudicial as to be incurable by striking it and admonishing the jury to disregard it.'" (*People* v. *Guillebeau* (1980) 107 Cal.App.3d 531, 547-548 [166 Cal.Rptr. 45], citing *People* v. *Woodberry* (1970) 10 Cal.App.3d 695, 708 [89 Cal.Rptr. 330].) Judged by these standards, the denial of a mistrial motion was proper in the present case. The evidence about Castro's presence in the car was cumulative of testimony already provided by Hernandez and Villarreal. In this regard, Cobos' testimony cannot be regarded as substantially incriminating. (*People* v. *Epps, supra*, 34 Cal.App.3d at pp. 156-158.) The cumulative nature of the evidence, coupled with the strong admonition of the trial judge, dissipated any injustice from admission of the evidence; thus, we find no abuse occurred when the court below refused to grant Castro's mistrial motion.

## IV

 Pointing to the fact that he was sentenced to life imprisonment plus a one-year enhancement per Penal Code section 12022, subdivision (a), Castro now contends that imposition of the enhancement was an abuse of sentencing discretion and a denial of equal protection. He predicates this claim upon comparison with the sentence levied upon Dominguez, which included imposition of a *concurrent* two-year enhancement for use of a firearm. We are not persuaded.

In the absence of a *clear showing* that its sentencing discretion was arbitrary or irrational, a trial court is presumed to have acted to achieve legitimate sentencing objectives and its discretionary determination to impose consecutive sentences will not be set aside on review. (*People* v. *Giminez* (1975) 14 Cal.3d 68, 72 [120 Cal.Rptr. 577, 534 P.2d 65].) Castro has failed to show that the trial court's sentence was arbitrarily imposed or the product of whimsical thinking. In sentencing Castro, the court noted: "The crime involved great violence. There was bodily harm and one victim was shot in the leg, and of course another one was killed. . . . There were multiple victims which I have already stated. There was planning and there was sophistication and it was quite well planned. He was on parole from the Youth Authority and of course had

failed parole miserably. Although the crimes as a juvenile are not major generally, nevertheless he had been to CYA and it hadn't done any good. He was displaying highly vicious behavior and he was very much an active participa[nt]."[28] Since Castro has not included a transcript which shows the court's reasons for so sentencing Dominguez, we believe it would be improvident to strike the consecutive enhancement imposed upon Castro. There is no *clear* showing that an abuse of discretion occurred in the present case. Similarly, we believe the differences in sentence imposed upon Dominguez and Castro do not indicate an equal protection violation.

V

Castro finally contends that he is entitled to additional custody credits and to good-time/work-time credits. We agree.

The abstract of judgment allows Castro only 220 days of custody credits. A proper calculation demonstrates, however, that he was entitled to 228 days.

Regarding his claim to good-time/work-time credits, this is compelled by *People* v. *Sage* (1980) 26 Cal.3d 498, 507, 509 [165 Cal.Rptr. 280, 611 P.2d 874].

The judgments as to Dominguez and Castro are affirmed. The Kern County Superior Court is directed to prepare a modified abstract of judgment indicating that appellant Castro is entitled to 228 days of custody credits and thereafter forward a copy of the modified abstract of judgment to the California Department of Corrections. The California Department of Corrections is directed to forthwith give full effect to the modification stated above and is directed to determine the presentence

---

[28]These were proper factors which could be used in imposing a consecutive sentence. Under rule 425 of the California Rules of Court, criteria affecting the decision to impose consecutive rather than concurrent sentences include: crimes involving separate acts of violence or threats of violence; crimes involving multiple victims; crimes having circumstances in aggravation. (Rule 425(a)(2), (a)(4), (b), Cal. Rules of Court.) Since aggravating circumstances can also be considered for purposes of imposing consecutive terms, the trial judge correctly took note that the crime involved great violence, planning, and sophistication (rule 421(a)(1), (8), Cal. Rules of Court) and involved a defendant who had engaged in a pattern of violent conduct, was on parole when the crime was committed, and had evidenced unsatisfactory performance on parole (rule 421(b)(1), (4), (5), Cal. Rules of Court).

conduct credits to which appellant Castro is entitled upon Castro's application for administrative determination of such credits.

Hopper, Acting P. J., and Andreen, J., concurred.

A petition for a rehearing was denied July 8, 1981.